726 A.2d 998 (1999)
320 N.J. Super. 119
C.M., Plaintiff,
v.
J.M., Defendant-Third-Party Plaintiff,
v.
W.P., Third-Party Defendant.
Superior Court of New Jersey, Chancery Division, Family Part, Monmouth County.
Decided January 5, 1999.
*999 Ellen Seigerman for plaintiff (Celantano, Stadmauer & Walentowicz, Clifton, attorneys), not appearing for within motion.
August J. Landi, Red Bank, for defendantthird-party plaintiff (August J. Landi, P.C., attorney).
Richard H. Singer, Jr., Livingston, for third-party defendant (Skoloff & Wolfe, P.C., attorneys).
LOCASCIO, J.S.C.
What happens when a husband is led to believe that children born during his marriage are his own, when, in fact, they are products of an ongoing affair between his wife and her paramour? This case examines the "Heart Balm" Act, the "outrageousness" required for a Ruprecht emotional distress claim, and whether such a claim extends to a non-spouse who is concededly the biological father of such children.
On February 27, 1998, plaintiff C.M. filed a divorce complaint against her husband, J.M. On March 10, 1998, based upon the following facts, J.M. filed a third-party complaint against plaintiff's paramour, W.P.
The M.s were married on October 14, 1989. Amidst a stormy relationship, C.M. gave birth to R.P. on January 1, 1995, and K.E. on January 25, 1997. In July, 1997, C.M. presented J.M. with the results of a June, 1997, DNA test indicating that W.P., C.M.'s immediate supervisor at work, was K.E.'s biological father. Thereafter, an altercation ensued *1000 between J.M. and W.P., culminating in their November, 1997, appearance in municipal court, where C.M. presented J.M. with the results of a September, 1997, DNA test indicating that W.P. was also the biological father of R.P. In his counterclaim and thirdparty complaint, J.M. seeks damages for emotional distress resulting from the severance of a financial and emotional bond with the children he was led to believe were his own.
The issue comes before this court on motion, by third-party defendant W.P., to dismiss the third-party complaint, contending same is barred by the "Heart Balm" Act, N.J.S.A. 2A:23-1 to -7, which bans the common law claims of: (1) criminal conversation, (2) seduction, (3) alienation of affections, and (4) breach of a promise to marry. Therefore, the threshold issue, to be considered by this court, is whether the allegations of the thirdparty complaint fall within any of the aforesaid four causes of action barred by the "Heart Balm" Act.
The standard to be applied to such an inquiry was set forth in Hafner v. Hafner, 135 N.J.Super. 328, 331, 343 A.2d 166 (Law Div.1975), where the court found it necessary to "determine whether all of the allegations in the complaint, taken together, actually state the proscribed cause of action for alienation of affections, or whether any other causes of action for which plaintiff might recover are pleaded." In view of R. 4:5-7, requiring all pleadings to be liberally construed, the court noted that "the essence of an actionable claim will be pieced out and sustained where the pleading is unclear." Ibid.
In the third-party complaint in issue, defendant alleges that third-party defendant W.P.:
1) "participated in and was a party to this fraud, deception and conspiracy, for several years; thus compounding, contributing to and causing the financial and emotional damages incurred by Defendant";
2) "used his position as superior to advance inappropriate and reckless sexual relations with his subordinate Plaintiff C.M.";
3) "advance[d] this negligent, reckless, intentional, and inappropriate conduct and relationship";
4) violated "his marital vows to his present wife, the code of conduct [of W.P.s' and C.M.'s place of employment], and his obligation to not intentionally, wantonly, or recklessly cause harm and injury to Defendant"; and
5) inflicted "unnecessary emotional distress, anxiety and pain that need not have occurred had the Plaintiff and Third-Party Defendant acted with restraint and forebearance (sic); or announced their affair at the outset."
The effect of the aforesaid conduct was set forth in paragraph 10 of the third-party complaint:
The conduct of the Plaintiff and Third-Party Defendant was so extreme and outrageous, as to be without regard to the high degree of probability of harm that would be incurred by Defendant and the aforesaid children after learning of such activities. The aforesaid conduct was beyond all reasonable bounds of decency, and was the proximate cause of Defendant's severe emotional distress and financial losses. (Emphasis added).
Where, as here, the pleading is unclear, these paragraphs guide this court in its required Hafner effort to piece out and sustain an actionable claim. Although many of the aforementioned third-party complaint allegations refer to various torts, paragraph 10, when liberally construed, alleges a cause of action for emotional distress as a result of not being informed of the paternity of children that J.M. fathered as if his own. J.M., in opposition to W.P.s' motion to dismiss the third-party complaint, contends that the "extreme and outrageous" conduct was not the extramarital affair between C.M. and W.P., but its ultimate effect upon the him and the children.
Because it is undeniable that none of the aforesaid third-party complaint allegations suggest a breach of a promise to marry, each of the three other causes of action, prohibited by the "Heart Balm" Act, must be considered in light of defendant's allegations.
*1001 "Seduction" is a common law tort actionable by a parent against an individual for violating their daughter's virginity. It was intended to recompense an aggrieved parent for the "consequent degradation, mortification, and wounded feelings visited upon [the daughter] as well as upon her parents" stemming from the child's "loss of chastity". Magierowski v. Buckley, 39 N.J.Super. 534, 555, 121 A.2d 749 (App.Div.1956). In the case at bar, because the third-party complaint is not brought by a parent of any of the litigants, the prohibition against the common law action for "seduction" is inapplicable.
"Criminal conversation" is a common law reference to adultery, which was seen as "criminal conversation with a man's wife". S.B. v. S.J.B., 258 N.J.Super. 151, 154, 609 A.2d 124 (Ch.Div.1992). Because each aforesaid allegation surrounds the illicit sexual relationship between W.P. and C.M., the third-party complaint seems, at first blush, to be barred by this prohibition of the "Heart Balm" Act. However, when all the allegations are read together and in context, it is clear that the third-party complaint refers to events which transpired after the purported adultery, namely, the birth of two children alleged to be J.M.'s. Because J.M. is seeking damages neither for his wife's adultery, nor for the emotional distress suffered as a result of that adultery, but rather for the emotional distress which resulted from learning that children he had been led to believe he fathered, were, in fact, born of the adulterous relationship, J.M.'s cause of action is not barred by the ban on causes of action for "criminal conversation."
"Alienation of affections" is the most broad-sweeping of the common law "Heart Balm" Act claims. At common law, an action for "alienation of affections" was for loss of consortium, i e., for a "loss of the marital affections, comfort, society, assistance and services of a spouse who has been wrongfully enticed away" from the existing marriage. Grobart v. Grobart, 5N.J. 161, 165, 74 A.2d 294 (1950). The essence of the action "is not the destruction of affection per se but loss of conjugal society with its mutual rights and obligations directly referable thereto". Id. (Citing Dey v. Dey, 94 N.J.L. 342, 344, 110 A. 703 (Sup.Ct.1920); Davenport v. Holden, 95 N.J.L. 197, 200, 112 A. 418 (E & A.1920)).
In support of his claim that the thirdparty complaint seeks damages for "alienation of affections", W.P. relies upon Kleinow v. Ameika, 19 N.J.Super. 165, 88 A.2d 31 (Law Div.1952), where a wife brought an action against her husband's paramour for enticing her spouse away from their family. Her claim, for the loss of the husband's "bounty, love and affection", was dismissed as violative of the "Heart Balm" Act Id. at 166, 88 A.2d 31.
However, in the instant matter, J.M. is not seeking recovery for the loss of CM's "bounty, love, and affection". Quite differently, J.M. looks to recover for emotional distress resulting from the dissolution of his relationship with children he raised as his own. He seeks damages for his splintered relationship with his alleged children, not for his dissolved martial relationship. Therefore J.M.'s claim is not for "alienation of affections", and thus is not barred by the "Heart Balm" Act.
Having concluded that the "Heart Balm" Act does not bar a claim for emotional distress resulting from permitting a husband to believe he is the biological father of two children, born as the result of an extramarital affair, this court must now consider two additional issues raised by the within motion: (1) at what point, over and above adultery, would an average member of the community consider a spouse's conduct to be so outrageous as to justify an emotional distress claim against the spouse, and, an issue of first impression, (2) whether liability for such conduct may attach to a paramour as well. That is, although it is well-settled that one spouse may bring a tort claim against the other spouse for intentional injuries sustained during the marriage, Tevis v. Tevis, 79 N.J. 422, 400 A.2d 1189 (1979), including a claim for intentional infliction of emotional distress, in the absence of physical injury, Ruprecht v. Ruprecht, 252 N.J.Super. 230, 599 A.2d 604 (Ch.Div.1991), this court must determine whether the facts alleged in the third-party complaint meet the criteria required *1002 to recover for such a tort, and, if so, whether such a claim should be permitted against an involved non-spouse.
In Ruprecht, 252 N.J.Super. at 236, 599 A.2d 604, spousal immunity was eliminated as a bar to emotional distress claims between spouses, where a spouse's conduct "may reasonably be regarded as outrageous". More specifically, in order to establish a claim for damages, the injured spouse must show "that the act was the proximate cause of the distress, and that the distress is severe". Id. at 237, 599 A.2d 604 (citing Buckley v. Trenton Savings Fund Soc'y, 111 N.J. 355, 366, 544 A.2d 857 (1988)).
New Jersey looks to the Restatement of Torts to clarify the threshold necessary to satisfy the "outrageous" element:
Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim "Outrageous!"
[Restatement (Second) of Torts § 4b cmt. d.]
In denying plaintiff's claim in Ruprecht, the court found that an adulterous affair alone, despite the obvious embarrassment and humiliation the faithful spouse incurs, is not sufficiently catalytic of resentment, in the average member of the community, to satisfy the "outrage" element of an emotional distress claim. Ruprecht, 252 N.J.Super. at 237-38, 599 A.2d 604.
Many of our sister states agree with Ruprecht that adultery alone, in the eyes of society, is not outrageous in and of itself. See, e.g., Strauss v. Cilek, 418 N.W.2d 378 (Iowa Ct.App.1987) (wife's tryst with husband's friend, although promiscuous, was not outrageous); Whittington v. Whittington, 766 S.W.2d 73 (Ky.Ct.App. 1989) (fraud and adultery did not reach the status of outrageous); Poston v. Poston, 112 N.C.App. 849, 436 S.E.2d 854, 856 (1993) (wife who "repeatedly exposed her mind and spirit and body to the sexual advances." of a man other than her spouse was not outrageous).
Some states do, however, find that an "outrage" does surface when an affair leads to the birth of a child held out to be another's. In Koelle v. Zwiren, 284 Ill.App.3d 778, 220 Ill.Dec. 51, 672 N.E.2d 868 (1996), Zwiren had a sexual liaison with her ex-boyfriend's son (Koelle). Nine months later, Zwiren gave birth and subsequently told Koelle, confidentially, that the child was his. Id., 220 Ill.Dec. 51, 672 N.E.2d at 870. Zwiren sought no financial support from Koelle because she knew that the father was not Koelle, but rather a client of her advertising agency. Ibid. Eight years later, after Koelle and the child grew close, a paternity test revealed that Koelle was not the child's father. Id., 220 Ill.Dec. 51, 672 N.E.2d at 871. His suit alleging, among other claims, intentional infliction of emotional distress was dismissed by the trial court, which held that "love and affection" were "noncompensable". Id., 220 Ill.Dec. 51, 672 N.E.2d at 875. The Illinois appellate court reversed, finding Koelle had sufficiently stated a claim because Koelle was seeking compensation not for losing the child's "love and affection", but for "the pain and anxiety he has felt due to (Zwerin's) alleged intentional infliction of emotional distress". Id.
Oklahoma has developed a similar posture. In Miller v. Miller, 956 P.2d 887 (Okla.1998), a husband (Jimmy) sued his ex-wife (Judy) and her parents for intentional infliction of emotional distress over a paternity issue. Because Jimmy was led to believe Judy was pregnant with his child, he subsequently married Judy, and, following their divorce, paid continuing child support. Id. at 892-93. Long after the divorce, the child informed Jimmy that her mother and maternal grandparents told her she was not Jimmy's daughter, and that she should get to know her "real" father. Ibid. The Oklahoma Supreme Court, in reversing the trial and appellate courts' dismissals, held that the Restatement's "outrageous" criteria were met by Jimmy's allegations, inter alia, of:
causing the plaintiff to develop a parental relationship with a child, believing that *1003 child to be his biological offspring, and then causing plaintiff to learn that the child was not biologically his own [and] using the plaintiff to fulfill the emotional, physical, and financial obligations of a husband for almost five years and of a father for fifteen years, knowing these obligations were not really his.

[Id. at 902.]
In Doe v. Doe, 122 Md.App. 295, 712 A.2d 132, 136 (1997), cert. granted, 351 Md. 161, 717 A.2d 384 (1998), Jane Doe had an affair with her art professor. Sometime after the birth of three children, her husband (John) discovered a love letter written by Jane to the professor. Ibid. When confronted, Jane told John that "although she had once been in love with (the professor), she had never had sex with him", and concealed the children's true paternity. Id. at 160, 712 A.2d 132. Two weeks later, J.M. found out, through DNA testing, that two of the three children born during the marriage were not his. Ibid.
The Maryland trial court dismissed J.M.'s emotional distress claim against his wife on a public policy basis that "such actions should be prohibited in the interest of judicial economy and the efficient administration of justice." Doe, 122 Md.App. 295, 712 A.2d at 138. See also, Steve H. v. Wendy S., 68 Cal.Rptr.2d 859, 946 P.2d 817 (Cal.1997). Furthermore, the court did not want to serve as the impetus "for interfamiliar warfare between husbands and wives where our courts would be flooded with litigation." Doe, supra, 122 Md.App. 295, 712 A.2d at 139.
The Maryland appellate court reversed, finding that the conduct alleged, namely, "not only that his wife had an adulterous affair, but also that as a result she bore two children, the true paternity of whom she deliberately concealed for three years," was intolerable and "more outrageous than that alleged in Whittington, Ruprecht and Poston". Id. 122 Md.App. 295, 712 A.2d at 159. The appellate court commented that even if Jane's acts were not intentional, the facts demonstrated "a high degree of probability that Mr. Doe would discover the truth", and thus constituted reckless behavior on Jane's part. Id. at 153. The appeals court, noting that Jane used John to "fulfill the emotional, physical and financial obligations of a father for three years, knowing those obligations were not really his," held that these additional actions, over and above the adulterous relationship, would indeed spur an average member of the community to exclaim "Outrageous!" Id. at 160. This court not only agrees, but feels compelled, based upon the facts in the within matter, to extend liability to the paramour as well. However,
it is not the individual opinion of this court, but the contemporary mores and conscience of society, which dictate, in the final analysis, the equitable resolution of this matter. "The morality of which equity speaks is that of society and not the judge's personal view of right and wrong."
[Monmouth County Div. of Soc. Serv. on behalf of the Div. of Youth and Family Serv. v. C.R., 316 N.J.Super. 600, 619, 720 A.2d 1004 (Ch.Div.1998) (citation omitted).]
W.P. contends that the third-party complaint must be dismissed because there was no duty to inform J.M. of the extramarital affair or the true paternity of the children. However, an independent cause of action for emotional distress may exist absent a duty owed to the injured party or physical injury per se. In Hume v. Bayer, 178 N.J.Super. 310, 319, 428 A.2d 966 (Law Div.1981), even though a patient suffered no underlying emotional distress, the court held that where a doctor told the patient's parents that their child suffered from a rare disease which could be cancerous, knowing that the child had only a mildly infected appendix, such conduct evidenced "either an intention to inflict emotional distress or a reckless disregard of the fact that such distress was probable". In sustaining the parents' action for emotional distress, the court held that "the existence or non-existence of an underlying independent cause of action [by the patient] is not essential to a cause of action for outrage". Id. at 317, 428 A.2d 966.
If one of the consequences of child birth includes financial support of the child, this court would be remiss not to make an appropriate award for same. If a consequence of child birth includes the infliction of emotional *1004 distress upon a spouse, who is deliberately, recklessly, and wrongfully led to believe he is the parent, this court would be delinquent not to permit an action for damages against more than the one involved party.
In the instant matter, it is conceded that the extra-marital affair started before, continued during, and transpired after the birth of both children. Much as in Doe, C.M. and W.P. behaved recklessly, in deliberate disregard of the high degree of probability that their affair would be uncovered after each birth, by maintaining their sexual relationship, and by concealing, from J.M., the true paternity of the children. Cf. Hume, supra. Biologically speaking, so long as W.P. engaged in sexual intercourse with C.M., neither can deny that a very probable result of the copulation was child birth. It is illogical to argue that both W.P. and C.M. engaged in acts of sexual intercourse, prior to the conception of R.P. and K.E., yet are not both connected to the matter as a proximate cause of their births. But for W.P.s' sexual participation in this extramarital affair with C.M., these two children would not have been born. Furthermore, W.P. abandoned any obligation to the children, while J.M. helped his wife feed, raise, fund, educate and nurture children that were not his own. This is indeed "outrageous" and, in the eyes of this court, W.P. is as accountable for these children as C.M., and thus should also bear responsibility for the consequences.
Keeping the duration of the affair a secret from J.M., as well as suppressing the true paternity of R.P. for almost three years, including four months after the paternity of K.E. had been disclosed, without regard to the high degree of probable harm to defendant, would indeed lead the average member of the community to exclaim "Outrageous!" Therefore, this court concludes that the allegations of the third-party complaint are severe enough to state a cause of action for emotional distress.
For the aforesaid reasons, third-party defendant W.P.s' motion to dismiss the thirdparty complaint is denied.